On June 7, 1977, appellant was arrested for the murder of Leartis Dubose, Jr. Subsequently, on the same day appellant appeared before the District Judge in Washington County, at which time he signed an instrument waiving a preliminary hearing and was bound over to await action by the Grand Jury. Appellant was admitted to bail in the amount of $7,500.00 during the course of this preliminary examination and was released from custody on June 11, 1977, having made bond.
Appellant was indicted by the Grand Jury of Washington County, October 6, 1977, for the first degree murder of Leartis Dubose. Appearing in the Circuit Court on October 25, 1977, with retained counsel, appellant was arraigned. At that time he entered pleas of not guilty and not guilty by reason of insanity to the charge against him.
On December 6, 1977, in the presence of his retained counsel, appellant entered a plea of guilty to murder in the second degree, following an extensive Boykin colloquy with the trial judge, all of which was reported by the Court Reporter. Sentencing was deferred until January 3, 1978, when appellant's punishment was to be set at eighteen years imprisonment in the penitentiary, pursuant to a settlement offer from the District Attorney of Washington County.
On the day of sentencing, appellant filed a motion requesting permission to withdraw his guilty plea of December 6, 1977, and reinstate his original pleas. That motion is set out, in pertinent part, below.
 "3. That Defendant's case was set for trial Monday, December 5, 1977, and on said date and prior to said case being called for trial, Defendant had an epileptic seizure in the Courtroom and was removed by ambulance to Jackson Municipal Hospital, Jackson, Alabama, and was admitted to said hospital; that as a result of said seizure, Defendant's shoulder was separated; that Defendant was treated by Dr. Charles E. May, a practicing physician at said hospital; that Defendant was given medication by Dr. May, including anesthesia in connection with resetting his shoulder; that Defendant was released from said hospital Tuesday, December 6, 1977, after receiving medication for pain and was told to return to Court; that there were negotiations between Defendant's attorney and the State prosecuting attorneys resulting in an agreement for a plea of guilty with a sentence of eighteen (18) years in the penitentiary; that due to the epileptic seizure and shoulder dislocation, Defendant was in pain and in a highly nervous and emotional condition and his agreement to change his plea to guilty was not his free and voluntary act in that his mental and emotional conditions were not such that he could make a calm, deliberate and rational decision regarding a plea of guilty."
* * * * * *
 "4. That Defendant received a severe head injury prior to the homicide with which he is charged and since said injury has been affected with periodic seizures and has been dependent upon his parents for counseling and advice; that he has attempted suicide subsequent to said injury and prior to the homicide."
* * * * * *
 "6. That the Defendant was on December 6, 1977, in such mental and emotional condition because of his illness and because of the medication for pain which had been administered to him that he could not rationally enter a plea of guilty *Page 1160 
with a full and complete understanding of the consequences thereof."
Sentencing of appellant was then deferred, pending a hearing on the aforementioned motion, which was held on January 30, 1978. After hearing evidence on the questions raised by appellant, the trial court denied the motion and imposed a sentence of eighteen years imprisonment in the penitentiary. On February 27, 1978, appellant filed a motion for new trial, alleging, inter alia, that the trial court erred in denying appellant permission to withdraw his plea of guilty. The trial court denied this motion on March 21, 1978.
Subsequently, it having been determined that appellant was indigent, trial counsel was appointed to represent him on appeal, notice of which was timely given; and a free transcript was provided him.
A trial judge may permit a defendant to withdraw a plea of guilty to enter one of not guilty up to thirty days after judgment on the plea of guilty. Woodard v. State, 42 Ala. App. 552, 171 So.2d 462. However, it is within the sound discretion of the trial judge to allow withdrawal of a guilty plea, and his refusal to allow such a request will not be disturbed except where an abuse of discretion is shown. Dawson v. State,44 Ala. App. 525, 215 So.2d 459, cert. denied, 283 Ala. 714,215 So.2d 463; Malone v. State, 41 Ala. App. 230, 132 So.2d 749, cert. denied, 272 Ala. 706, 132 So.2d 752. Of course, if a defendant has not freely and voluntarily entered a guilty plea, the trial court has abused its discretion if it has denied the defendant permission to withdraw the faulty plea. Shellnut v.State, 43 Ala. App. 298, 189 So.2d 587, cert. denied, 280 Ala. 28, 189 So.2d 590.
To aid in a determination of the voluntariness vel non of appellant's guilty plea, the evidence, where it is pertinent to his mental state at the time of his plea, adduced at the hearing on his request to withdraw the plea, is set out below.
Mattie Boykin testified that she was the mother of appellant, who was twenty-seven years of age and lived at home. On December 5, 1977, she was in court with her son waiting for his case to come to trial. At that time, appellant became ill and was admitted to Jackson Municipal Hospital for treatment by Dr. Charles E. May. Dr. May set appellant's shoulder which was dislocated during the seizure appellant had at the courthouse. Appellant remained in the hospital overnight and was released to appear in court on December 6, 1977. While at the hospital, Mrs. Boykin testified, appellant was given medication for pain. Appellant also took medication three times a day to prevent seizures. These seizures had begun about a year ago after appellant sustained a head injury from a fall out of a tree. After having a seizure, Mrs. Boykin testified, appellant ". . . don't be normal. He just don't be right is all I know how to tell you, anyway it bes a difference for several hours before he comes around like he's supposed to."
Mrs. Boykin further testified that she was present during plea negotiations on December 6, 1977. Appellant appeared to be more nervous than usual. Appellant's father told appellant that he should take the settlement offer in order to "go on and get it over with." Appellant, Mrs. Boykin testified, did not reply to these exhortations. Mrs. Boykin did not recall whether appellant ever agreed to plead guilty.
Appellant also testified that he had sustained head injuries about a year ago and that he had had seizures periodically ever since then. After having a seizure, appellant testified, he felt weak and depressed, it taking him "practically all day to get normal and back to myself."
Appellant recalled having a seizure on December 5, 1977, and subsequently being in the hospital. Appellant remembered being on "high medication," but did not know what time he was admitted or subsequently discharged. Nor did he remember what time he appeared in court the next day. Appellant testified that during the plea negotiations, his shoulder and head ached; he was "ready to go home . . ., and I wanted to leave." At the time he entered the guilty plea, appellant testified, he was *Page 1161 
in pain and wanted to "get it over with." Appellant further testified that he was influenced by his father's opinion that he should accept the settlement offer.
During cross-examination of appellant by the District Attorney, the following occurred:
 "Q. Now, did he later come back in there and tell you that he had talked further with the State prosecutors and they would not accept a plea of guilty and an eighteen year sentence? Did you understand that?
 "A. I think he and my father had a conversation. I wasn't in it.
 "Q. I understand you say he was talking to your daddy, but did you hear him talking?
"A. I heard him, yes, sir.
"Q. All right, and did you understand it?
"A. Yes, sir.
 "Q. Do you understand based on what he was telling you that if you plead guilty that you would go to the penitentiary for eighteen years?
"A. Yes, sir.
"Q. Did you agree to that?
"A. Yes, sir.
 "Q. You told Mr. Williams that you would agree to that?
"A. Yes, sir.
 "Q. After you done that did you come out into the court room and stand up before Judge Kimbrough?
"A. Yes, sir.
 "Q. Do you remember him asking you questions and explaining to you what you were charged with?
"A. Yes, sir.
 "Q. All right, and you do remember him asking you questions?
"A. Yes, sir.
 "Q. And do you remember him explaining to you what you were charged with?
"A. Yes, sir.
 "Q. Now, when you answered Judge Kimbrough's questions did you understand those questions?
 "A. Yes, sir. Based about my knowledge I did, yes, sir.
 "Q. When you answered the questions did you understand what you answered?
"A. Yes, sir.
 "Q. In other words, if you said, `No, sir', you knew that you were saying no, sir to that question, didn't you?
"A. Yes, sir.
 "Q. And if you said, `Yes, sir', you knew you were saying yes, sir, to that question?
"A. Yes, sir.
 "Q. Let me ask you if you remember this question that Judge Kimbrough asked you. `Do you understand that you are entitled to a trial by jury?'?
"A. Yes, sir.
 "Q. Do you remember Judge Kimbrough asking you that question?
"A. Yes, sir.
"Q. And that your answer was, `Yes, sir.'?
"A. Yes, sir.
 "Q. Do you remember him asking you this question: `Do you understand that you have a right to confront your accusers in this case.' That is the folks that were charging you with this crime? Do you remember him asking you that question?
"A. Yes, sir, but I don't understand it.
 "Q. `Do you understand that you have a right to confront the witnesses that are accusing you?' Do you remember him asking you that question?
"A. Yes, sir.
"Q. And you answered, `Yes, sir.'?
"A. Yes, sir.
 "Q. Do you remember him asking you this question, `Do you understand that you are not required to give any testimony against yourself?'? That means testify against yourself.
"A. Yes, sir.
 "Q. And do you remember answering, `Yes, sir' to that question?
"A. Yes, sir.
 "Q. Let me ask you this question. Do you remember this question, `Do you understand that any plea you make in this case must strictly be voluntary?'? *Page 1162 
"A. I don't quite understand it.
 "Q. Do you remember Judge Kimbrough asking you, `Do you understand that any plea you make in this case must strictly be voluntary?'
"A. Yes, sir.
"Q. And do you remember you answered, `Yes, sir.'?
"A. Yes, sir.
 "Q. Did you understand the questions that Judge Kimbrough asked you?
"A. Based upon my knowledge, I did.
 "Q. All right, and did you understand the answers you gave him when you said, `Yes, sir.'?
"A. Yes, sir.
 "Q. Now then, the next question Judge Kimbrough asked you was this, `To a charge of murder in the second degree, as based in the indictment, how do you plead, guilty or not guilty?' Do you remember that question?
"A. Yes, sir.
"Q. Do you remember answering, `Guilty'?
"A. Yes, sir.
"Q. Did you understand that question?
"A. I didn't quite, I was — I was mixed up.
"Q. Do you know what murder means?
"A. Yes, sir.
 "Q. It means the unlawful killing or illegal killing of another human being, do you understand that?
"A. I understand it.
 "Q. And that's what Judge Kimbrough asked you about whether you was guilty or not guilty of killing somebody unlawfully?
"A. Yes, sir.
"Q. And you said you were guilty?
"A. Yes, sir.
"Q. All right, and did you understand that question?
"A. I understood it.
"Q. And did you understand your answer?
"A. Yes, sir."
Dr. Charles E. May, whose qualifications were admitted by defense counsel, testified that he saw appellant as a patient on December 5 and 6, 1977. At Jackson Hospital, Dr. May set appellant's dislocated shoulder which resulted from a fall during a "Jacksonian" epileptic seizure. Dr. May also testified that he spoke with appellant on December 6, 1977, before he was discharged from treatment. Appellant spoke with Dr. May coherently and was oriented as to time and place. Dr. May testified that it was his opinion that as of the morning of December 6, 1977, appellant understood what was "going on around him"; understood the difference between right and wrong; understood the difference between guilty and not guilty; understood the term "eighteen years in the penitentiary"; and if explained to him, would understand the meaning of murder. Dr. May further testified that any medication given to appellant would have no effect on appellant after twenty-four hours.
Appellant's hospital records, admitted into evidence, show that he was admitted to the hospital on December 5, 1977, at 2:20 p.m., and discharged December 6, 1977, at 11:10 a.m. Those records further reflect that appellant was given no medication after 7:40 p.m. on December 5, 1977. That substance was Demerol, the effect of which, Dr. May testified, dissipated within four hours.
The testimony of Dr. May was sufficient for the judge to find that medication received by appellant at the hospital did not impede a rational choice on his part to enter a plea of guilty.U.S. v. Goodman (5th Cir., 1970) 432 F.2d 75. In Goodman, supra, the defendant had received an injection of morphine at 9:30 a.m. and entered a guilty plea at 2:30 p.m. The attending physician testified that the effects of the medication would have dissipated by 1:00 p.m.
Similarly, in Hanes v. State, 56 Ala. App. 711, 325 So.2d 219, cert. denied 295 Ala. 404, 325 So.2d 221, this Court held that the trial judge did not err in accepting the defendant's guilty plea where it was undisputed that defendant knew right from wrong, and that he was able to communicate with his counsel and other witnesses. *Page 1163 
From the evidence adduced at the hearing it does not appear that the trial court abused its discretion by denying appellant permission to withdraw his plea of guilty.
Since the guilty plea is valid, and was properly accepted by the trial court, the record is purged of any other error. Buttsv. State, Ala.Cr.App., 346 So.2d 497, cert. denied, Ex ParteButts, Ala., 346 So.2d 500. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.