[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 12 
 Introduction
On May 7, 2001, Medell Banks entered a "best interest" plea to manslaughter, a violation of § 13A-6-3(a)(1), Ala. Code 1975.[1]
On June 25, 2001, the trial court sentenced Banks to 15 years in prison.[2] This appeal arises from the trial court's denial, after an extensive evidentiary *Page 13 
hearing,[3] of Banks's motion to withdraw his guilty plea.
The facts in this case are disputed. Banks's wife, Victoria Banks, was serving time in jail following a conviction on charges unrelated to the instant case. In February 1999, while still in jail, Victoria told authorities that she was pregnant. On February 25, 1999, the sheriff allowed her to visit Dr. Katherine Hensleigh. Victoria told the doctor she was pregnant, and the records of the visit indicate that a fetal heartbeat was heard. Victoria visited the doctor again a month later, still maintaining that she was pregnant, and the records of that visit indicate a fetal heartbeat was again heard. Subsequently, Victoria told the sheriff that she wanted to be released from jail to have the baby; she threatened to sue because she was not receiving prenatal care while she was in jail. (R. 344.)
On May 14, 1999, Victoria was released from jail. On August 3, 1999, approximately two months after the baby should have been delivered (R. 265), the sheriff encountered Victoria in town and asked her about the baby. Victoria claimed to have had a miscarriage. On that same day, the sheriff escorted Victoria to Dr. Hensleigh's office, where a nurse examined Victoria and determined that there was no evidence of any retained products of conception.
Banks was taken into custody on August 6, 1999. He, Victoria, and her sister, Diane Tucker, were interrogated several times about the alleged pregnancy.[4]
As an explanation for Victoria's change in condition, the prosecution maintained that, on or about June 16, 1999 (C. 463), Banks, Victoria, and her sister participated in the smothering or live burial of a baby born to Victoria that evening. The State based its case on incriminatory statements allegedly made by Banks;[5] on Banks's *Page 14 
voluntarily escorting officers on two occasions to the area where he said he had left the baby in a hole, to no avail; on Victoria's twice telling Dr. Hensleigh, who attended to her while she was in jail, that she was pregnant; on Dr. Hensleigh's having heard a fetal heartbeat during both of Victoria's visits; on Victoria's telling the sheriff that she was pregnant; on Victoria's statements to two women who ministered to her in jail regarding her pregnancy; and on a forensic report that a drop of blood found on a couch in an abandoned mobile home contained DNA from a female "and most probably originated from a close female relative of Victoria Banks." (C. 86.)[6] As for motive, the State alleged that Banks was angry because he was not the father of the alleged baby, and that Victoria's boyfriend, who had been convicted of raping Banks's ten-year-old stepdaughter, was the father of the baby.
Before Banks entered the guilty plea, it was the defense's position that Victoria had had a tubal ligation[7] in 1995 and that she could not have given birth at the time of the alleged crime. The defense argued that Banks, who had a verbal IQ of 57, gave his statements under the duress of *Page 15 
intense and prolonged interrogation without the aid of counsel.
The State in turn argued that, although Victoria had had a tubal ligation, the procedure had failed, and she was therefore able to, and did, become pregnant in 1998. The State relied on Dr. Katherine Hensleigh's testimony that she believed that Victoria had been pregnant because, when she examined Victoria in February and March 1999, she twice heard a fetal heartbeat and she measured her fundal height to be 24 centimeters.[8]
At his guilty plea proceedings, Banks disputed the factual basis relied upon by the State. (R. 15.) Banks maintained his innocence, stating:
 "Your Honor, I don't think I have been treated fairly. I got a son out there I love, I want to be with the rest of my life, do what I can to be with him, show him all the love, respect I can. For this here, I don't think I been treated fairly.
 "And it hurts me in my heart to get time for something I didn't do. I wasn't there. I don't know nothing about nothing."
(R. 83.)
Subsequent to the guilty plea proceedings, but before the sentencing proceedings, Banks's trial counsel acquired Victoria's consent to submit to an examination called a hysterosalpingogram (hereinafter "HSG") in order to determine whether the tubal ligation had been effective. At the sentencing hearing, Banks filed a motion for a medical examination of Victoria. The trial court granted this motion on the same day.
As described by Dr. Michael Steinkampf,[9] the physician who performed the HSG on Victoria, the test involved the following:
 "What you do is, you inject dye, a dye that blocks x-rays, up through the cervix into the uterine cavity and see if it comes out the tubes. There's different ways to inject the dye. What we use is a special catheter, cannula, shaped like a plastic acorn, fits tightly against the outside of the cervix. It's got a little straw that extends up into the uterine cavity.
 "Then you inject the dye. As you inject, you're taking x-rays, sort of like an x-ray TV, really, that you're watching as the dye goes up into the uterine cavity. And then you can take still photos of it or static x-rays as you're doing this procedure.
 ". . . First you put a speculum in, that's something you put into the vagina to open it up. And put a clip on the cervix. What we do at our clinic, we put a speculum in, then irrigate the vagina with an antiseptic to minimize the risk of infection. Then put a little bit of lidocaine or numbing medicine, a local anesthetic on the cervix, then grasp it with a grasper, it's called a tenaculum, a single tooth tenaculum. And then put that particular acorn with the little straw on the end up through the cervix. You *Page 16 
actually attach it to the clip, to the tenaculum. Then you have the syringe on the other end and you inject the dye."
(R. 115-16.)
The HSG was performed on July 12, 2001. The test revealed that Victoria's fallopian tubes were in fact completely occluded, that is, blocked, as of the date of the examination. Based on the results of the test, on July 16, 2001, Banks filed a motion to withdraw his guilty plea, or in the alternative, for a new trial. On July 18, 2001, Banks filed an amendment to the motion. On August 20, 2001, the trial court conducted an evidentiary hearing on the motion. On September 7, 2001, Banks filed a memorandum in support of his motion to withdraw his guilty plea, to which the State responded on September 17, 2001.
In its answer to Banks's motion to withdraw his guilty plea and during the evidentiary hearing, the State maintained that, although Victoria's tubes were shown to be blocked in July 2001, her tubes were clear in the summer of 1998 and she was able to, and did, become pregnant. The State maintained that the blockage detected in July 2001 resulted from a venereal disease and occurred subsequent to the pregnancy.
On September 28, 2001, the trial court issued an order denying Banks's motion to withdraw his guilty plea. That order stated, in pertinent part:
 "This Court treats the Defendant's motion as a motion for new trial under Rule 24 of the Alabama Rules of Criminal Procedure. It should be noted from the outset that it is not this Court's duty to decide whether or not Victoria Banks was ever pregnant. That is a question of fact which is to be decided by a jury. Of course, a jury was never given the opportunity to decide this issue as the Defendant pled guilty and in so doing waived his right to a jury trial. The sole issue before this Court is, therefore, whether or not the Defendant should be granted a new trial because of newly discovered evidence. Alabama law sets out the requirements that must be met in order to obtain a new trial based on newly discovered evidence. To establish a right to a new trial based on newly discovered evidence, the Defendant must show the following: (1) that the evidence will probably change the result if a new trial is granted; (2) that the evidence has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching. Ex Parte Heaton, 542 So.2d 931 (Ala. 1989). In the opinion of this Court, it is this first element which is primarily in dispute, and it is this element that has not been met by the Defendant.
 "The focus of the Defendant's motion centers around the testimony of Doctor Michael P. Steinkamp[f] who testified that a hysterosalpingogram was performed on Victoria Banks, which test reflected that a bi-lateral tubal ligation had been performed on Ms. Banks in 1995 and that, in his opinion, the tubal ligation procedure was effective and pregnancy could not have occurred subsequent to the tubal ligation. Unquestionably, this testimony is important and significant. However, under Rule 24 of the Alabama Rules of Criminal Procedure, this Court cannot say that had this test been presented to the jury that `the result probably would have been different.' It must be noted that there has been presented to this Court substantial testimony that the codefendant, Victoria Banks, was in fact pregnant. Doctor Katherine Hensleigh, a well-respected local family practitioner, testified that on *Page 17 
two separate occasions she performed an examination of Victoria Banks. Her examination of Victoria Banks was conducted on February 25, 1999, and March 30, 1999. Her medical records were introduced into evidence and these records reflect not once, but on two separate occasions, Doctor Hensleigh heard and documented fetal heart tones. Doctor Hensleigh further testified about her physical examination of Victoria Banks and noted that Victoria Banks' fundal height was approximately 24 centimeters. This is a commonly accepted test where measurements are taken from the pubic bone to the top of the uterus. The fundal height examination of 24 centimeters is undisputedly strong evidence of pregnancy. Additionally, Doctor Hensleigh and Doctor Timothy Hughes, formerly with the Mobile Ob-Gyn Clinic, who had reviewed the medical records in this case, gave medical explanations as to how Victoria Banks could have been pregnant in February and March, 1999, yet her fallopian tubes showed blockage per the hysterosalpingogram performed by Doctor Steinkamp[f] in July, 2001. Their opinion was that sexually transmitted diseases or infections can cause blockage of fallopian tubes and that the examinations of Victoria Banks in August of 1999, confirmed that she had a sexually transmitted disease or infection. This medical testimony, presented by the State of Alabama, coupled with the following testimony presented to the Court, i.e.:
 "1. An oral statement made by Medell L. Banks, Jr., to Sheriff Lolley, ABI Investigators Huggins and Vinson that he was present when the child was born, that he participated in smothering the child, and buried the child in the woods;
 "2. Uncontradicted testimony that the Defendant on two occasions carried numerous law enforcement officers to the area where he contended he buried the child;
 "3. Victoria Banks['s] telling Doctor Hensleigh that she was pregnant;
 "4. Victoria Banks['s] telling Doctor Hensleigh that her husband was not the father of the child;
 "5. Victoria Banks['s] telling Sheriff Lolley that she was pregnant;
 "6. Victoria Banks['s] telling Connie James [who ministered to Victoria in jail] that she had a baby;
 "7. Victoria Banks['s] telling Agent Huggins, after the proceedings to grant a motion for new trial has been filed, that she had in fact had the baby;
 "would lead the Court to feel comfortable in saying that the newly discovered evidence presented by the Defendant might cause a different verdict but this Court cannot state, as a matter of law, that it would probably result in a different verdict, which is the standard of proof under a Rule 24 Motion for New Trial.
 "For those reasons above, the Defendant's oral motion made in Court that the charges be dismissed [is] likewise denied."
(R. 42-46.) This appeal followed.
I. Effect of Denial by Operation of Law
Initially, we address Banks's contention that, because his motion to withdraw his guilty plea was denied by operation of law, see Rule 24.4, Ala.R.Crim.P., the trial court's written order denying his motion, issued after the denial by operation of law, is to be given no presumption of correctness. Rule 24.4 provides:
 "No motion for new trial or motion in arrest of judgment shall remain pending in the trial court for more than sixty (60) *Page 18 
days after the pronouncement of sentence, except as provided in this section. A failure by the trial court to rule on such a motion within the sixty (60) days allowed by this section shall constitute a denial of the motion as of the sixtieth day; provided, however, that with the express consent of the prosecutor and the defendant or the defendant's attorney, which consent shall appear in the record, the motion may be carried past the sixtieth day to a date certain; if not ruled upon by the trial court as of the date to which the motion is continued, the motion is deemed denied as of that date, unless it has been continued again as provided in this section. The motion may be continued from time to time as provided in this section."
Although the record indicates that the hearing on Banks's motion was set for August 20, 2001, the record does not indicate that both parties expressly consented to continue the motion past the 60th day. Therefore, the motion was denied by operation of law pursuant to Rule 24.4. SeeEdgar v. State, 646 So.2d 683, 685 n. 1 (Ala. 1994).
For his proposition that the trial court's findings are not to be afforded a presumption of correctness, Banks cites Edgar v. State,646 So.2d 683 (Ala. 1994). In Edgar, the defendant filed a motion for a new trial based on newly discovered evidence. The trial court held a hearing well beyond 60 days from sentencing. The trial court denied the motion for a new trial, but did not include in its order any specific findings. The Alabama Supreme Court held:
 "We hold that where, as here, a criminal defendant's motion for a new trial is denied under the provisions of Rule 24.4, Ala.R.Crim.P., without an affirmative statement by the trial judge giving the ruling a presumption of correctness and the defendant supports his new trial motion by evidence that was not presented at trial, and that evidence, if not controverted by the State, will entitle him to a new trial, the denial by operation of law should be reversed and the case remanded for the trial court to conduct a hearing on his motion for new trial and then enter an order either granting or denying the motion. This holding is consistent with the above stated purposes. It does not permit a post-trial motion to remain pending in the trial courts for an inordinate period of time. This procedure does not undermine the finality of the judgment, because the only other alternative under the circumstances of this case would be to reverse the judgment of conviction and remand for a new trial, throwing out not only the judgment denying the motion, but also the judgment on the merits of the case. This resolution also fulfills the purposes of Rule 1.2, Ala.R.Crim.P., of ensuring `fairness in administration, and the elimination of unnecessary delay and expense' that would be caused by granting a new trial before the trial judge had ruled on the motion."
646 So.2d at 687-88 (emphasis added).
In the present case, unlike in Edgar, we have before us an affirmative statement by the trial court. We recognize that this order has no legal significance, as the trial court no longer had jurisdiction over the motion to withdraw the guilty plea because it had been denied by operation of law.[10] Although we agree with the appellant's contention that the trial court's order should not be given a presumption of correctness, that order, though tardy, is enlightening as to what action the trial court *Page 19 
might take if we were to remand this cause pursuant to Edgar. However, because we have an affirmative statement by the trial court, there is no need to remand this cause to the trial court and bestow upon it the jurisdiction to hold a hearing or enter another order, as in Edgar.
Additionally, in Edgar, although the trial court had already held a hearing, it had done so beyond the 60-day period; therefore, it did not take evidence until after the motion had already been denied by law. In the present case, the hearing occurred before the motion was denied by operation of law; therefore, it would be unnecessary to remand this cause for the trial court to hold another hearing. Such remandment would amount to a formality and would be a waste of judicial resources and time.
II. The Ex parte Heaton Conditions
We note at the outset that, after extensive research on the issue of withdrawing a guilty plea on the basis of newly discovered evidence, we found a paucity of cases in this and other jurisdictions.
Rule 14.4(e), Ala.R.Crim.P., provides: "The court shall allow withdrawal of a plea of guilty when necessary to correct a manifest injustice." Rule 14.4(e) was enacted two years after the Alabama Supreme Court's decision of Ex parte Heaton, 542 So.2d 931 (Ala. 1989), wherein the Court prescribed five requirements that had to be met in order for a court to allow the withdrawal of a guilty plea based on newly discovered evidence. We find nothing in the Rule or in the Comments to that Rule indicating that Rule 14.4(e) superseded Heaton. Thus we evaluate the record before us to determine whether there exists a manifest injustice in need of correction, and, in making that determination, we evaluate the allegedly newly discovered evidence with Heaton in mind.
With the advent of Rule 14.4(e), all five requirements of Heaton do not necessarily have to be met in order for a court to find that a manifest injustice requiring the withdrawal of a guilty plea has occurred; moreover, a court can certainly consider factors outside of Heaton's five inquiries, in order to determine whether to allow the withdrawal of a guilty plea to correct a manifest injustice. Nonetheless, the Heaton
inquiries render the process less subjective and supply courts with a general framework for a manifest injustice determination.
 "The law in Alabama is clear that whether a defendant should be allowed to withdraw a plea of guilty is a matter solely within the discretion of the trial court, whose decision will not be disturbed on appeal absent a showing of abuse of discretion. State v. Holman, 486 So.2d 500, 503 (Ala. 1986); Tiner v. State, 421 So.2d 1369, 1370 (Ala.Crim.App. 1982); Boykin v. State, 361 So.2d 1158, 1160 (Ala.Crim.App. 1978). The courts recognize that a plea must be entered intelligently and voluntarily, Tiner, 421 So.2d at 1370, and informing a defendant of the nature of the charge and the consequences of a guilty plea is crucial to the defendant's fashioning an intelligent and voluntary waiver. Chapman v. State, 412 So.2d 1276, 1277 (Ala.Crim.App. 1982). The fact that the defendant later becomes dissatisfied with his sentence will not constitute a ground for invalidating the plea. Holman, 486 So.2d at 503; Chapman, 412 So.2d at 1278.
 "The petitioner in the present case does not allege that he was uninformed as to the nature of the charge or the possible consequences of a guilty plea or that his plea was involuntary. Rather, he argues that certain newly discovered evidence entitles him to withdraw his guilty plea and entitles him to a new *Page 20 
trial. There are circumstances in which newly discovered evidence can serve as a valid ground for invalidating a guilty plea after sentencing and for receiving a new trial. Dawson v. State, 44 Ala. App. 525, 215 So.2d 459 (1968), cert. denied, 283 Ala. 714, 215 So.2d 463 (Ala. 1968). These circumstances are set forth in a long line of cases on the subject of newly discovered evidence.
 "The standard of review for cases involving the grant or denial of a new trial based on newly discovered evidence is the same as that for a motion to withdraw a guilty plea.
 "`"The appellate courts look with disfavor on motions for new trials based on newly discovered evidence and the decision of the trial court will not be disturbed absent abuse of discretion." Further, "this court will indulge every presumption in favor of the correctness" of the trial judge's decision. The trial court is in the best position to determine the credibility of the new evidence.'
 "Isom v. State, 497 So.2d 208, 212 (Ala.Crim.App. 1986) (citations omitted). To establish a right to a new trial based on newly discovered evidence, the petitioner must show the following: (1) that the evidence will probably change the result if a new trial is granted; (2) that the evidence has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching."
542 So.2d 931, 933 (Ala. 1989) (some internal citations omitted; emphasis added.) See also Doty v. State, 647 So.2d 41 (Ala.Crim.App. 1994);Hudson v. State, 623 So.2d 387 (Ala.Crim.App. 1993). Thus the Heaton
inquiries offer a framework for ascertaining whether the evidence is actually newly discovered, as opposed to newly disclosed, and, if newly discovered, whether the evidence indicates that a manifest injustice has occurred in allowing the defendant to plead guilty to the charges in question.
We begin the manifest injustice analysis by addressing each Heaton
inquiry in turn.
 A. Would the Newly Discovered Evidence Probably Have Changed the Result?
As we noted above, certainly all five requirements of Heaton do not necessarily have to be met in order for a court to find that a manifest injustice has occurred. However, it is difficult to imagine a newly discovered evidence case in which a court could find that the existence of a manifest injustice required that a defendant be allowed to withdraw his guilty plea without determining that the newly discovered evidence would probably have changed the result. Thus, it would appear that the first Heaton inquiry would have to be answered in the affirmative if ever there was to be a determination of manifest injustice.
Although not affording the trial court's order a presumption of correctness, we do note that the trial court focused on the first inquiry, that is, whether the evidence would probably have changed the result if a new trial were granted. Specifically, the trial court found that, had a future jury been presented with all of the evidence, including the newly discovered evidence, Banks nonetheless would have been found guilty of manslaughter by a future jury because "there ha[d] been presented to [the trial court] substantial testimony that . . . Victoria . . . was in fact pregnant." (C. 44.) Particularly relying on the State's evidence of Victoria's alleged sexually transmitted disease (STD), it found that Banks had failed to prove that the results *Page 21 
of the HSG would probably have changed the outcome of the proceedings.
After a review of the record, for the reasons below, we hold that the record reflects that the results of the HSG would probably have changed the outcome of the proceedings if a trial were held.
The results of Victoria's HSG, according to Dr. Steinkampf, were that her fallopian tubes were occluded and that her tubes had been occluded since her bilateral tubal ligation in 1995. Dr. Steinkampf testified that, barring some other surgical intervention such as in vitro fertilization or a tubal reversal[11] followed by another tubal ligation, Victoria could not have become pregnant subsequent to her tubal ligation in 1995. Dr. Steinkampf testified to this several times, including when the trial court asked him directly. (R. 162, 167, 170.) When the district attorney asked Dr. Steinkampf if an HSG is 100% "consistent," Dr. Steinkampf testified that he "couldn't imagine how it would be any other way," but admitted that "[n]othing in this life is a hundred percent." (R. 175.)
Dr. Hensleigh's and Dr. Hughes's testimony regarding a possible STD was unsupported by the record. The record reveals that Dr. Hensleigh's testimony was not entirely founded on personal experience. She did not personally examine Victoria when she presented with the cervical discharge; rather, the nurse practitioner examined Victoria. Therefore, Dr. Hensleigh based her opinion on her records of having treated Victoria, with those records having been admitted into evidence.[12]
However, Dr. Hensleigh's records do not reflect that, on August 3, 1999, Victoria was diagnosed with a "pelvic infection" or STD. The records reflect that the sheriff brought Victoria to the office for the doctor to ascertain whether Victoria had had a baby. During this examination, Nurse Blount noted, "cervix [with] thick white discharge." (C. 339.) Thus there is only a notation in the record that Victoria, nearly a year after she allegedly became pregnant, *Page 22 
had a cervical discharge. There is no notation that this discharge was present when Victoria allegedly became pregnant. There is no notation that this discharge was excessive or problematic or that it had been causing Victoria any distress. There is no notation that the nurse practitioner was concerned by the presence of this discharge. There is no notation that any medication was prescribed for this discharge. There is no notation that Victoria was diagnosed with any pelvic condition whatsoever during this visit with the nurse practitioner.[13]
Victoria returned to the doctor eight days later on August 11, 1999. On that day, Victoria was prescribed an antibiotic to be taken twice a day for seven days — to treat a urinary tract infection. There is no notation that she was suffering from a "pelvic disease"; no notation of any follow-up examination of a cervical discharge.
Nowhere in any of Dr. Hensleigh's records, upon which she relied in her testimony, is there any discussion of, diagnosis of, or treatment for a "pelvic disease," other than a urinary tract infection. Nowhere in the record before us does anyone testify that a urinary tract infection is an "infectious disease" or a "pelvic disease" that could cause the occlusion of a woman's fallopian tubes.
Dr. Hensleigh, as she stated during her testimony, could not remember Victoria's visits to her office and relied on the information in her own records. Because those records do not reflect at any point that Victoria had ever presented symptoms of, had ever been diagnosed with, or had ever been treated for a "pelvic disease," Dr. Hensleigh's testimony was inaccurate and therefore could not have negated what the trial court described as the "important and significant" results obtained by the HSG. Additionally, Dr. Hughes based his opinion on the testimony of Dr. Hensleigh. Because Dr. Hensleigh's testimony had no basis in the record, neither did the testimony of Dr. Hughes regarding the effect of an STD or an infection on Victoria's tubal ligation.
Furthermore, when asked if he had an opinion as to whether Victoria's tubal occlusion resulted from a bilateral tubal ligation or from an infection, Dr. Steinkampf responded that such an occlusion, in his opinion, could only have resulted from a bilateral tubal ligation. He explained:
 "Well, I can tell you in my personal experience, and this is a practice where we have patients referred in, mostly with infertility or sometimes to have their tubes put back together, so, they have had a tubal ligation, and I have seen plenty of both. As the other expert witnesses have correctly pointed out, tubal infection is a common cause of infertility. If the HSG is abnormal, if we get an HSG that is not normal those patients, virtually all those, undergo a laparotomy. We can look [at] what the tubes are like, we can see if there's an infection. If there had been infection in [the] past, you can tell that.
 "I have had no cases where the [results of the] HSG looked like [those of Victoria], and the patient ultimately was found to have had damage secondary to tubal infection. *Page 23 
 "On the other hand, of the patients that come in that have had a tubal ligation, we do HSG, and an HSG would be done in those patients if we wanted to see how much tube there was . . ., if we were going to put it together, or if we were going to do an in vitro fertilization, make sure the uterine cavity didn't have any fibroid polyps or something.
 "In those cases this is the typical finding. This is. I am 0 for 2000, as far as finding infection with this type of picture. This is a very characteristic HSG for a person that's had a tubal ligation."
(R. 348-49.) (Emphasis added.) Steinkampf reiterated several times that Victoria's HSG results were not indicative of tubal occlusion caused by an infection. (R. 147, 150-51.)
Even if there had been some evidence indicating that Victoria had suffered from a pelvic infection at some point, Dr. Steinkampf testified that, out of 2000 tests where the results of the HSG resembled Victoria's results — bilaterally even stubs with no significant scarring at the ends of her fallopian tubes — none of those HSG results were attributed to an infection.
Therefore, although the record is replete with generalized testimony of the possibility that an infection could cause a woman's fallopian tubes to become occluded, there is no evidence in the record indicating that a specific infection caused Victoria's fallopian tubes to become occluded at a specific time relevant to this case.
Taking out of consideration, then, the notion that Victoria's fallopian tubes became occluded as a result of a pelvic infection, according to the testimony of all of the doctors during this evidentiary hearing, we are left with the possibility that, in order to become pregnant since her bilateral tubal ligation in 1995, Victoria would have had to have undergone a tubal reversal followed by another tubal ligation, or she would have had to have undergone in vitro fertilization. There is absolutely no evidence indicating, nor was there ever any insinuation, that Victoria had undergone any sort of surgical intervention to circumvent her bilateral tubal ligation.
Arguably, direct, objective evidence that controverts subjective, circumstantial evidence can be used by a jury to find reasonable doubt. If the newly discovered evidence can be used by a future jury to find reasonable doubt, then the admission of such evidence at trial would probably change the result of the proceedings.
Considering the evidence presented during these proceedings, a future jury could presumably find that Banks proved to a medical certainty that Victoria could not have been pregnant subsequent to her 1995 tubal ligation. The evidence of a murder, or of a baby for that matter, as it existed at the time Banks pleaded guilty, consisted of inconsistent and undocumented statements by Banks, see note 5; of testimony that Banks voluntarily took officers to the scene of the alleged crime, which was to no avail because no physical evidence of a baby was ever found (R. 240); of Dr. Hensleigh's subjective tests indicating that Victoria was pregnant;[14] and of Victoria's statements to Dr. Hensleigh, to the sheriff, to religious counselors who visited her in jail, and to the ABI agent, all of which she contradicted during her testimony at these proceedings.[15] Taking the evidence discovered as a result *Page 24 
of the HSG, which was direct and objective, in conjunction with all of the existing evidence of a baby and a murder, which either was not supported by the record, or was circumstantial or subjective, we hold that the results of the HSG would probably have changed the result of the proceedings, because the results of the HSG could be used by a future jury to find a reasonable doubt that a baby had ever been born and, in turn, that a murder had ever occurred.
B. Was the Evidence Discovered Since the Trial?
The second inquiry is whether the evidence must have been discovered since the trial. Although it was known before the guilty plea proceedings that Victoria had undergone a tubal ligation in 1995, the result of the tubal ligation, that is, whether the tubal ligation had been effective, was not known until after judgment had been entered. The record reflects, and the State does not dispute, that the HSG was not conducted until after Banks had pleaded guilty and had been sentenced.
 C. Could the Evidence Have Been Discovered Before the Trial by the Exercise of Due Diligence?
The third inquiry is whether the evidence could have been discovered before the trial by the exercise of due diligence. There was some discussion during the plea withdrawal proceedings as to whether defense counsel had had a chance to speak with Victoria in an attempt to obtain her to consent to the HSG. One of Banks's defense counsel testified that cocounsel had talked with Victoria several times while she was in jail, but then she was sent to prison. Cocounsel testified:
 "I think he talked with her before she left. I know he talked to her up there [in prison]. I remember on an ongoing basis his talking about efforts to get Victoria Bell Banks to consent to having some type of test [that might] show whether or not she could have had a baby. It was a tedious situation because she was not our client, [Banks] was."
(R. 209.)
Cocounsel testified that there were three primary obstacles to obtaining Victoria's consent to undergo the HSG: the expense, because, evidently, the procedure was to be done at no expense to the State; the fact that Victoria was not their client; and the fact that counsel was of the opinion that, because the HSG was an invasive procedure, a court could not order Victoria *Page 25 
to undergo it without her consent.[16] (R. 210.)
We also note that there was testimony indicating that, on Friday, June 22, 2001, defense counsel, in the presence of the district attorney, discussed the HSG procedure and moved the trial court for a continuance of Banks's sentencing hearing, which was to be held the following Monday. Although the trial court agreed to allow Victoria to have the procedure performed,[17] it did not agree to continue Banks's sentencing. (R. 218.)[18]
The State asserts in its brief that "[t]here is nothing in the record, however, besides Banks's attorneys' unsupported statements, to show that Banks exercised `due diligence' to obtain the HSG test" before judgment was entered. (Appellee's brief, p. 22-23.)
As for the State's argument, we note that 1) there was "corroborating" testimony that, before the sentencing hearing, defense counsel attempted to obtain a continuance, but the trial court refused; 2) defense counsel's testimony regarding due diligence was elicited, and remained consistent, during both direct examination by the district attorney and on cross-examination by cocounsel; and 3) there is also *Page 26 
nothing in the record to refute defense counsel's statements. Thus, we find no reason to discount defense counsel's assertions of due diligence.
While we understand that Victoria may have been reluctant to participate while her case was still pending, we agree that arguably more could have been done by trial counsel after she had entered her guilty plea. The problem arises in the fact that the law was unclear as to whether or not the trial court could have ordered Victoria to undergo the HSG. See note 16, supra. Because the law was and is unclear, we conclude that any analysis regarding this factor would be uncertain.
However, although we do not hold that due diligence was necessarily exercised by defense counsel in this case, nonetheless a finding of manifest injustice is still possible. A defendant should still be allowed to withdraw his guilty plea, even if due diligence was not necessarily exercised by his trial counsel, particularly in a case of compelling newly discovered evidence.
D. Was the Newly Discovered Evidence Material?
The fourth inquiry is whether the evidence is material to the issue. The State does not dispute the materiality of this evidence. Clearly, whether Victoria could bear a child in the summer of 1999 is material to the issue of whether Banks participated in killing a child alleged to have been born to Victoria in the summer of 1999.
E. Was the Newly Discovered Evidence Merely Cumulative or Impeaching?
The final Heaton inquiry is whether the evidence was merely cumulative or impeaching.
Black's Law Dictionary 755 (7th ed. 1999) defines "impeach" as "[t]o discredit the veracity of (a witness)." The evidence is not impeaching in that Banks did not seek to discredit the veracity of any witnesses. Rather, the results of the HSG served to controvert, that is, disputed the State's witnesses's findings and opinions, not their credibility.
However, even if this evidence were merely impeaching, a finding that a manifest injustice has occurred is still possible. See, e.g., Story v.State, 439 So.2d 1317, 1322 (Ala.Crim.App. 1983) ("[I]t is generally not error to deny a motion for new trial based on newly discovered evidence tending only to discredit the state's witness unless `upon the whole case it appears probable that the new evidence would change the result.'Maund v. State, 254 Ala. 452, 48 So.2d 553.").
In Story, the appellant had been convicted of trafficking in marijuana found in another man's trunk. After her conviction and sentencing, an undercover officer came forward with information he had learned while present at a drug deal. The officer testified that the man who had owned the car in which the marijuana was found told him that "the marijuana was his and he had his friends come and testify that the marijuana was appellant's and had been in her car." 439 So.2d at 1320. The Court stated:
 "In Houston v. State, 208 Ala. 660, 95 So. 145 [(1923)], a case very similar to the present case, our Supreme Court stated:
 "`The trial court will not, of course, be put in error for refusing a new trial because of newly discovered evidence when such evidence would not be admissible upon a retrial of the cause. This purported newly discovered evidence, being affidavits of two witnesses that the state's witness Felton admitted to affiants that he, and not the defendant, killed deceased, is but *Page 27 
hearsay evidence — an extra-judicial confession — and would not be admissible to show that another committed the offense. A defendant can disprove his guilt by proving the guilt of some other person. Brown v. State, 120 Ala. 342, 25 So. 182
[(1899)]; McDonald v. State, 165 Ala. 85, 51 So. 629
[(1910)]. But this must be done by legal evidence, and not by the testimony of witnesses who heard another admit that he committed the offense; this is the merest hearsay — is but an extra-judicial confession or admission but admissible in evidence. Welsh v. State, 96 Ala. 92, 11 So. 450 [(1892)]; Underhill on Criminal Evidence (2d Ed.) p. 276, § 145. While this newly discovered evidence was not admissible to show that another committed the offense, it will be admissible to impeach or contradict Felton, who testified as a witness against the defendant, after laying a predicate, and which was not done on the former trial because the proof shows that this newly discovered evidence was unknown to the defendant or his counsel at the time. This witness Felton was the most important one who testified against the defendant, and it is in fact questionable as to whether or not the state made out a case without his testimony and we are not able to say that proof of these statements would not probably change the result.' [Emphasis added.]
 "The nature of Officer Parrish's testimony leads to the same result as in Houston. Not only would his testimony completely undermine Wall's testimony, it would also undermine every other state's witness who knew Wall and gave adverse testimony concerning appellant's actions leading up to the police stopping Wall's car. Each of these witnesses, in one form or another, denied at trial what Parrish testified Wall told Parrish he had them do — appear in court and falsely accuse appellant of attempting to sell marijuana. It is certain that the state failed to make a prima facie case without this line of testimony from Wall's friends, since the only testimony linking appellant with the marijuana came from these witnesses, and `we cannot say that proof of these statements would not probably change the result.' Houston, supra. This is especially so in light of the apparent neutrality of Officer Parrish and lack of motive in falsely testifying, as opposed to the obvious potential bias of Wall's friends and acquaintances who testified against appellant. We also note the potentially great weight a jury might give an apparently neutral officer of the law.
 "In a similar case, our Supreme Court held that the trial court erred in denying the defendant's motion for a new trial based on the pretrial testimony of two attorneys who represented the defendant at trial. According to the two attorneys the state's main witness told them she lied when she gave highly incriminating testimony at trial. The court stated:
 "`But as far as this record is concerned we have the testimony of two reputable members of the bar which shows that the chief witness for the state admitted to them that she had lied under oath in regard to extremely vital and material matters. Their testimony stands uncontradicted in this record. As before indicated, Fay Kelsoe was the only witness for the state who directly connected Woodard with the murder of Dean.
 "`Unquestionably this evidence was discovered since the trial of Woodard and no lack of diligence in connection with its discovery appears. It is *Page 28 
certainly material to the issue and is not of a cumulative nature. We think it such that it could change the result upon another trial. As before indicated, the jury which tried Woodard did not have the benefit of this evidence.' Woodard v. State, 251 Ala. 314, 36 So.2d 897 [(1948)].
 "A jury would presumably give Officer Parrish's testimony even more weight because of his apparent detachment.
 "Even though Parrish's testimony would only be admissible to discredit or impeach the state's main witnesses, our Supreme Court has held that it is generally not error to deny a motion for new trial based on newly discovered evidence tending only to discredit the state's witness unless `upon the whole case it appears probable that the new evidence would change the result.' Maund v. State, 254 Ala. 452, 48 So.2d 553 [(1950)]. As discussed above, we cannot say this would not be the result if the evidence were before the jury. See also, Morris v. State, 25 Ala. App. 156, 142 So. 592 [(1932)]; Grissett v. State, 18 Ala. App. 675, 94 So. 271 [(1922)]; affirmed Ex parte State, 208 Ala. 439, 94 So. 274 [(1922)]."
439 So.2d at 1321-22 (emphasis added).
In the present case, Dr. Steinkampf's testimony that Victoria could not have been pregnant in the summer of 1999 undermined every State's witness who testified that she had, in fact, been pregnant. While we do not make a credibility determination, we do note, as we did in Story, that a future jury would presumably afford more weight to the testimony of Dr. Steinkampf, a renowned expert in his field and the doctor who had performed the HSG on Victoria, than it would have afforded to the testimony of Dr. Hensleigh, a general practitioner who, although she testified that she heard a fetal heartbeat and measured Victoria's fundal height, failed to perform any type of pregnancy test, or even a simple pelvic exam. Thus, because of the potential impact of the HSG results, even if the results of the HSG constituted merely impeaching evidence, it is nonetheless necessary to allow Banks to withdraw his guilty plea in order to correct a manifest injustice.
It is a closer question whether the results of the HSG constitute merely cumulative evidence. Black's Law Dictionary 577 (7th ed. 1999) defines "cumulative evidence" as:
 "Additional evidence of the same character as existing evidence and that supports a fact established by the existing evidence (esp. that which does not need further support)."
The fact that Victoria had had a tubal ligation in 1995 was known and undisputed when Banks pleaded guilty. What was disputed was whether the tubal ligation had been effective. At Victoria's trial, even the doctor who performed the procedure testified that he could not say with any certainty that the operation had been successful or that, as a result of the tubal ligation, Victoria had been unable to become pregnant since 1995.
Before the HSG, the evidence of the effectiveness of the tubal ligation was founded on speculation and subjective tests. The HSG provided a nonspeculative and objective test that resulted in proof that the tubal ligation performed in 1995 had been effective. Thus it is the objective character of the evidence provided by the results of the HSG that renders such evidence noncumulative.
Most indicative of the noncumulative nature of the HSG evidence is the fact that its discovery both inspired one witness to change his previous testimony and compelled *Page 29 
the State to attempt to present new evidence in rebuttal. If the character of the HSG results was such that the evidence provided by the results was merely cumulative to that evidence in existence prior to the test, then it follows that the HSG results would have had no effect on the existing evidence. However, in this case, after the HSG test was performed and its results disseminated, Dr. MacLennan's expert opinion testimony changed, and the State attempted to present its own new evidence in response to the HSG results.
First, Dr. John MacLennan, the physician who performed the tubal ligation on Victoria, testified as the State's witness (C. 209A) at her trial that he could not be certain that the tubal ligation had been effective. During the evidentiary hearing in the present case, he testified that, since the HSG had been conducted on Victoria, he agreed with Dr. Steinkampf that the only way Victoria could have become pregnant subsequent to the tubal ligation would involve surgical intervention, that is, a tubal reversal, followed by another tubal ligation to account for the current occlusion, or in vitro fertilization. (R. 184.) The State questioned him:
 "[Defense counsel]: Dr. MacLennan, if you had had the benefit of a[n] HSG test result, previous to the prior testimony you gave, would that have changed your opinion as to the way you rendered it in that case?
"[Witness]: Probably."
(R. 181.)
Second, the State, in response to the HSG results, attempted to present new evidence that Victoria had suffered from a sexually transmitted disease or from pelvic inflammatory disease. If the HSG results had been merely cumulative, the State could have rested on the existing evidence as sufficient to rebut the HSG results, rather than being compelled to argue anew.
Moreover, the HSG results did not support a fact established by the previously existing evidence. As stated above, the effectiveness of the tubal ligation had not yet been established. Thus, the HSG results provided evidence of a fact that had not yet been established and, therefore, certainly needed further support.
The HSG results in the present case are even more compelling than the undercover officer's testimony in Story. The testimony of Dr. Steinkampf, a nationally renowned expert in the field of fertility, presumably would be considered by a future jury to be more credible than the testimony of Dr. Hensleigh, a general practitioner who had performed cursory examinations on Victoria and who was not present during the HSG.See Story, supra. For these reasons, we hold that the HSG results were not merely impeaching or cumulative to the already existing evidence in this case.
III. Other Factors
Finally, we note that, in assessing whether a manifest injustice has occurred, we are not restricted to the Heaton inquiries, but look also at the totality of the circumstances of each case. There are two such other factors in this case that we find to be relevant.
First, the trial court, confronted with the newly discovered evidence in this case, although denying Banks's motion for a new trial, attempted to commute Banks's sentence to time served in its order denying the motion to withdraw the guilty plea.[19] Arguably, this implies that the *Page 30 
HSG results were at least compelling enough to cause the trial court to try to amend Banks's sentence.
Additionally, without passing judgment on the voluntariness of Banks's statements, we are concerned with the circumstances surrounding the uncounseled, three-day, custodial interrogation of Banks, a mentally retarded adult with a verbal IQ of 57, particularly in light of the United States Supreme Court's concerns with the potential for "false statements" when interrogating mentally retarded adults, as expressed inAtkins v. Virginia, 122 S.Ct. 2242, 2252 (2002). The great bulk of the evidence in this case was circumstantial, and the inculpatory statements made by Banks certainly lent credence to the circumstantial evidence. The admissibility of the statements at trial, already questionable, see note 5, supra, is certainly rendered more tenuous in the face of the HSG results.
 Conclusion
As analyzed above, the newly discovered evidence in this case was material and would probably have changed the outcome of the proceedings in that the HSG results can be used by a future jury to find reasonable doubt. The HSG results were discovered after Banks had pleaded guilty and had been sentenced, and, arguably, the HSG results could not have been discovered before he pleaded guilty. Finally, the HSG results were not merely cumulative or impeaching.
Additionally, we note that the trial court attempted to reduce the sentence it had imposed on Banks after hearing the newly discovered evidence and expressed concern over the circumstances surrounding Banks's statements to law enforcement.
Therefore, after evaluating the circumstances of this case in theHeaton framework and any other relevant information in the record that would indicate whether a manifest injustice had occurred in this case, we hold that a manifest injustice has occurred in this case. We reverse the denial by operation of law of Banks's motion to withdraw his guilty plea and remand this cause for the trial court to grant Banks's motion to withdraw his guilty plea. The trial court shall conduct further proceedings consistent with this opinion.
REVERSED AND REMANDED.
McMillan, P.J., and Shaw, J., concur. Wise, J., concurs in the result, with opinion. Baschab, J., dissents, with opinion.
[1] On August 9, 1999, Medell Banks, Jr., was arrested and, on August 24, 1999, he was charged in district court with murder, a violation of § 13A-6-2, Ala. Code 1975. (C. 436, 463.) Counsel was appointed for Banks on or about August 26, 1999. On September 28, 1999, the district court ordered that Banks undergo a mental evaluation and set the preliminary hearing for October 28, 1999.
In the meantime, on September 24, 1999, the case was transferred to circuit court. The record is unclear, but at some point Banks was apparently rearrested on September 17, 1999, after having been indicted on September 15, 1999, for capital murder, a violation of §13A-5-40(a)(15), Ala Code 1975. On March 16, 2000, the circuit judge ordered, on motion of both Banks and the district attorney, that the indictment against Banks be dismissed and that Banks be reindicted for capital murder because the previous indictment was factually incorrect. The case before us arises from that corrected indictment.
[2] Banks's codefendants, his wife, Victoria Banks, and her sister, Diane Tucker, also pleaded guilty to manslaughter and were sentenced to 15 years in prison.
[3] Unless otherwise indicated, any testimony or admission of evidence referenced in this opinion occurred during the evidentiary hearing held on Banks's motion to withdraw his guilty plea.
[4] According to Agent Charles Huggins, as of August 7, 1999, Victoria and Banks had been interviewed three or four times. (R. 230.)
[5] We have gleaned the following information regarding statements made by Banks from the record before us of the evidentiary hearing on Banks's motion to withdraw his guilty plea:
 Kenneth Mitchell, who worked for the Board of Pardons and Paroles and who was ordered by the trial court to prepare a presentencing report, wrote at length in his report concerning Banks's admissions. However, on the stand, he admitted that he had gleaned his information from talking with Agent Huggins, from talking with the sheriff, and from an unsigned document written by the sheriff purporting to be a statement by Banks, which is not in the record before us. Mitchell testified that, after thoroughly reviewing the district attorney's file and the Alabama Bureau of Investigations' file, he did not recall any inculpatory statement signed by Banks. (R. 22.)
 Agent Huggins testified that, on August 5, 1999, the sheriff took a statement from Banks, but Agent Huggins was not present when the statement was taken. (R. 49-51.) Agent Huggins testified, from his notes, that Banks denied any involvement in the alleged killing of the baby. There is not a waiver of rights form signed by Banks regarding this statement and no other evidence of this statement in the record before us.
 Agent Huggins testified that he took a statement from Banks on August 7, 1999, and that in that statement Banks initially again denied involvement with any baby killing, but after Victoria, who was present, harangued him, he admitted that the baby cried when it was delivered. (R. 54.) The statement was not written, but Huggins recorded it and took notes. Agent Huggins testified that Banks signed a waiver before giving the statement. A summary in the record states, "Medell related that he did not help to deliver Victoria's baby, but Medell heard the baby cry when it was born. Medell voluntarily agreed to escort investigators to Jackson Circle for the search for the baby." (C. 262.) The waiver of rights form regarding this statement is in the record. However, when the tape recording of the statement was played in court, it was incomprehensible, and evidently all that could be understood was Banks's asking to go home. (R. 232.) No transcript of this audiotape is in the record before us.
 Evidently, two other statements were taken by Agent Huggins subsequent to August 7, 1999, but the dates of these statements are not in the record before us. In the first, Banks allegedly again agreed to take officers to where he had disposed of the baby's body. In the second, Banks allegedly stated that he was drunk when he disposed of the baby's body, but he would nonetheless try to remember the location of the body. (R. 54.) Neither the waiver of rights forms, nor the notes, nor the transcripts of the tapes of this statement is in the record before us. Additionally, no physical evidence of a baby was ever found on the occasions when officers escorted Banks to search for the baby.
 On June 14, 2000, Banks spoke with officers concerning the case. The transcript of that discussion is in the record before us. (R. 81-85.) Banks's waiver of rights form signed before this discussion is also in the record. Banks asked the officers about the status of the case against him and how it would progress. The officers attempted to ask him where the baby's body was, and Banks responded, "Now I ain't come in here to ask no more questions, like I told you from the last time, I'm through with that[,] man. I got me a lawyer with that, I'm through with that, I ain't fixin to go back over that and talk about that no more." (C. 84.)
[6] The record also contains a statement from George Bonner, Victoria's boyfriend, who had been convicted of sexually assaulting Victoria's 10-year-old daughter. Bonner maintained that, in August 1998, Victoria "was pregnant and showing all the signs of a pregnant woman." (C. 77.) The State did not rely on this during any of the proceedings, particularly in light of the fact that Victoria's due date was allegedly the first week of June 1999, more than 10 months after Bonner said he noticed that Victoria was "showing."
[7] According to the record, Victoria underwent a procedure known as a bilateral Pomeroy tubal ligation. According to testimony, when performing this procedure, the doctor
 "takes the middle part of the [fallopian] tube and . . . pull[s] it up, like it's a little knuckle or u-shaped piece. [The doctor] put[s] a suture around it and tie[s] it tightly, . . . snip[ping] off a little part of the tube, little knuckle of the tube. [The doctor] lets[s] the remainder of the tub fall back into the abdomen. [The doctor] ha[s] a little piece of the tube that [has been] removed to send to the pathologist to confirm the tubal ligation was done appropriately."
(R. 108-09.) In Victoria's case, her doctor also cauterized the cut ends of her fallopian tubes.
[8] Fundal height is the distance from the pubic bone to the top of the uterus. It is a measurement used to estimate how far along a pregnancy is. After approximately 20 weeks into the pregnancy, the fundal height in centimeters is roughly equal to the duration of the pregnancy in weeks. (R. 140.)
[9] The record contains an 18-page curriculum vitae describing Dr. Steinkampf's numerous professional publications. At the time of these proceedings, Dr. Steinkampf held several positions with the University of Alabama in Birmingham, Department of Obstetrics and Gynecology: Professor; Director, Division of Reproductive Biology and Endocrinology; Director, Gamete Biology Laboratory; Laboratory Director, In Vitro Fertilization Program; and Director, Division of Reproductive Biology and Endocrinology Sonography Laboratory.
[10] In Edgar, the Alabama Supreme Court on remand bestowed upon the trial court jurisdiction to enter its order beyond the 60 days allowed by Rule 24.4, Ala.R.Crim.P.
[11] In this procedure, a doctor attempts to reverse the tubal ligation in order to allow the woman to become pregnant.
[12] As a witness for the State, Dr. Hensleigh testified that her records reflected that her nurse practitioner, Becky Blount, treated Victoria for "a sexually transmitted disease." (R. 263-64.) Later, on cross-examination, Dr. Hensleigh testified as follows:
 "[Defense counsel]: Dr. Hensleigh, you testified, I believe I am correct, you testified on direct examination that your office, maybe Becky Blount, treated Victoria Bell Banks for STD?
"[Witness]: Yes, she did.
"[Defense counsel]: What was the date of that?
 "[Witness]: The day she examined [Victoria] on August 3rd of 1999, as she examined her, her uterus was slightly enlarged. She was very tender and did have a discharge, and she treated her for infection then.
 "[Defense counsel]: Do we know what kind of infection that was?
 "[Witness]: Pelvi[c] infection. She saw her back, she was still very tender she put her on antibiotic, which would be appropriate.
 "[Defense counsel]: My question is, do we know what kind of infection that was, other than a PID [pelvic inflammatory disease]?
"[Witness]: She did not culture it.
 "[Defense counsel]: We don't have a culture; is that correct?
"[Witness]: That is correct."
(R. 276.) Toward the end of the proceedings, Dr. Hensleigh testified, in response to a question by the trial court, that in 2001 Victoria had "repeated infections that scarred [and blocked her fallopian tubes] where certainly [no egg cells] could get through." (R. 303.) She also responded affirmatively to the district attorney's questioning that she did have "documentation that [Victoria] did have an infectious disease present in her uterus in August of `99." (R. 314.)
[13] In response to questioning as to why no one in her office swabbed or cultured Victoria's cervix, Dr. Hensleigh testified that "in [my] practice my people are too poor to be paying for all these cultures." (R. 295.) During his testimony, Dr. Hughes agreed with Dr. Hensleigh's opinion of culturing a possible infection and stated, "I would say in my practice if I saw a patient I suspected, clinically, had PID, I would treat that patient with appropriate antibiotics. That really makes a culture an academic or moot point." (R. 313.)
[14] Dr. Hensleigh, Dr. Hughes, and Dr. Steinkampf testified that they were aware of incidents where a doctor reported hearing a fetal heart tone when there was no fetus. (R. 302, 321, and 172.)
[15] As the trial court noted in the footnote to its order,
 "The credibility of Victoria Banks is extremely questionable with this Court. It is noted that she testified at this hearing on August [20], 2001. On direct examination, she confirmed that when she pled guilty she had admitted to [the circuit judge handling her case] that she had had the child back in 1999 and what she told him at the time she entered her plea was the truth. On cross-examination, she then denied ever having the baby. She has apparently told investigators and numerous other people that she was, in fact, pregnant during the spring of 1999 but has likewise made numerous statements, after the investigation of this matter occurred, that she was not pregnant. This Court can place absolutely no credibility in her testimony."
(C. 45.) We note that, on redirect by the district attorney during these proceedings, Victoria, although admitting that she had lied to people about her pregnancy, continued to deny that she had ever had a baby. We also note that, although the trial court found Victoria to be less than credible, five of the seven portions of testimony listed by the trial court in its order as "leading [it] to feel comfortable in saying that the newly discovered evidence presented by the Defendant might cause a different verdict, but [not] as a matter of law . . . probably result in a different verdict" were statements by Victoria both before and after this investigation began. (C. 45-46.) (Emphasis in original.)
[16] Several questions were asked at oral argument before this Court on the issue of whether the trial court could have ordered Victoria to undergo the HSG without her consent. Although we are not called upon to answer the question, we think it appropriate to mention that, in this area, the law is unclear; there is no case on point. Without deciding that issue, we note that we question whether a trial court has the authority to order a woman to undergo what is obviously an invasive and potentially painful, if not deadly, procedure. Although the United States Supreme Court has held that a blood test is permissible and does not constitute an unreasonable deprivation of Fourth Amendment rights, seeSchmerber v. California, 384 U.S. 757, 771 n. 13 (1966) ("`The blood test procedure has become routine in our everyday life. It is a ritual for those going into the military service as well as those applying for marriage licenses. Many colleges require such tests before permitting entrance and literally millions of us have voluntarily gone through the same, though a longer, routine in becoming blood donors.'" (quotingBreithaupt v. Abram, 352 U.S. 432, 436 (1957)), it has held otherwise in conjunction with the surgical removal of a bullet. See Winston v. Lee,470 U.S. 753, 766 (1985) ("The operation sought will intrude substantially on respondent's protected interests. The medical risks of the operation, although apparently not extremely severe, are a subject of considerable dispute; the very uncertainty militates against finding the operation to be `reasonable.' In addition, the intrusion on respondent's privacy interests entailed by the operation can only be characterized as severe. On the other hand, although the bullet may turn out to be useful to the Commonwealth in prosecuting respondent, the Commonwealth has failed to demonstrate a compelling need for it.").
Although one of the doctors testified that Victoria did not experience any pain during the HSG, that doctor was not present during the test and further testified that the test was intrusive and dangerous. (R. 185-86.) Moreover, Dr. Steinkampf testified that the test was painful and that the standard risks associated with this test are allergic reaction; infection; interruption of pregnancy; and death from pulmonary embolism. (R. 98, C. 352.) Therefore, we cannot say with certainty that the trial court could have ordered Victoria to undergo the HSG without her consent even if defense counsel had more vigorously petitioned the Court for such.
[17] The trial court ordered the Department of Corrections to produce Victoria for her to undergo the HSG. The trial court also ordered that Victoria was to be responsible for all expenses incurred in connection with the HSG and "all related costs and expenses." (C. 282.)
[18] The trial court had also previously stated in a letter dated April 6, 2001, that it did not plan to continue this case beyond the week that it was set for trial, the week of May 14, 2001. (C. 229.)
[19] However, the State petitioned for a writ of mandamus and, because the trial court attempted to alter Banks's sentence after 30 days had passed from the date of the original sentence, the trial court had lost jurisdiction to alter or amend sentence; therefore, this Court granted the writ.