COBB, Judge,
dissenting.
I believe Anthony Ray Hinton is entitled to a new trial. At the hearing on his Rule 32, Ala. R.Crim. P., petition, he proved that his attorney was ineffective and that the State of Alabama had violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Postconviction relief in the form of a new trial would be warranted on either ground alone; together, however, they form a powerful pair of reasons that, in my opinion, mandate that a new trial be granted to Hinton. Therefore, I dissent from the main opinion.
I.
Hinton alleged in his Rule 32 petition that his trial counsel provided ineffective assistance because, he argued, counsel presented an unqualified firearms witness to testify on what the parties have always agreed, and continue on appeal to agree, was the crucial evidence — the bullets obtained at the crime scenes and the gun found at Hinton’s mother’s residence. He alleged that the defense witness “was not qualified to examine and determine projectile matches; his credibility was severely attacked on cross-examination, and exploited by the state in closing.” (C. 418.) Hinton further alleged:.
“Counsel was additionally ineffective to not seek additional funds when it became obvious that the individual willing to examine the evidence in the case for the $1,000 allotted by the court was incompetent and unqualified. Indeed, this failure to seek additional, sufficient funds is rendered all the more inexplicable by the trial court’s express invitation to counsel to seek more funds if such funds were necessary. [TR. 10-12.]”[17]
(C. 419.)
In determining that trial counsel’s performance was not ineffective, the majority quotes and adopts portions of the circuit court’s order.[18] The circuit court and the majority have mischaracterized the substance of Hinton’s claim and have used that mischaracterization to hold that trial counsel’s performance was effective. The majority states, “ ‘Hinton alleges that his trial counsel was deficient for not presenting *316 any[19] evidence that the bullets found at the crime scenes were not fired from the gun found at his mother’s house; however, Hinton’s counsel did put on such testimony.’ ” 172 So.3d at 284 (quoting (C. 1547)). The majority summarizes the testimony of Andrew Payne, the defense witness who testified that none of the crime-scene bullets matched the gun recovered from Hinton’s mother’s house, and concludes that ‘“the trial record clearly refutes Hinton’s claim that his trial counsel was ineffective for failure to present testimony in rebuttal to the State’s ballistics evidence.’” 172 So.3d at 284 (quoting C. 1548). The majority also addresses Hinton’s claim that trial counsel was ineffective for failing to seek additional funds to hire a qualified expert witness by stating that Hinton alleged “ ‘that a qualified ballistics expert would have testified that the bullets fired at the three crime scenes were not fired by the gun recovered at his mother’s house,’ ” and by stating, “ ‘this is exactly what [Hinton’s] ballistics expert testified at trial.’ ” 172 So.3d at 284 (quoting C. 1549-50).[20]
As to both claims, which are interrelated, the majority has avoided the essential arguments Hinton has made about trial counsel — that he was ineffective for presenting an unqualified expert at trial and that he was ineffective for failing to seek additional funds to retain a qualified expert to testify. As Hinton has clearly alleged, the error was not trial counsel’s failure to present an expert to rebut the State’s evidence, but his failure to present a competent expert. Hinton proved at the Rule 32 hearing that counsel rendered deficient performance and that he suffered prejudice as a result of trial counsel’s failure to seek additional funds to retain and present a competent expert to testify about the very evidence that all of the parties agree was crucial to the case. Hinton proved these claims, and the trial court should have granted him a new trial.
A. Funding for a defense expert
In January 1986, trial counsel filed a request for approval of extraordinary expenses in each of the capital cases in which he was representing Hinton. (TC. 1997-2000, 2115-18.)[21] Counsel stated in the motions that he could not adequately prepare his defense without an opportunity to have an independent expert test the firearm and bullets and that the expert he had contacted quoted a fee of $95 per hour, plus expenses. At the first hearing held in this ease, on February 7, 1986, to consider pretrial motions, the trial court granted the motions for funds to hire an expert. The trial court granted up to $500 for each case and stated:
“I don’t know as to what my limitations are as for how much I can grant, but I can grant up to $500.00 in each case as far as I know right now and I’m granting up to $500.00 in each of-these two cases for this. So if you need additional experts I would go ahead and file on *317 a separate form and I’U have to see if I can grant additional experts, but I am granting up to $500.00, which is the statutory maximum as far as I know on this and if it’s necessary that we go beyond that then I may check to see if we can, but this one’s granted.”
(TR. 10.)(Emphasis added.)
On March 4, 1986, trial counsel filed a motion to continue the trial because he had been unable to obtain a firearms expert. (TC. 2016-17.) At the June 17, 1986, hearing on the motion, trial counsel acknowledged that the firearms evidence was crucial. He listed the names of several potential witnesses he had contacted and stated that many of them required more than $1,000 for their services. (TR. 63-70.) Trial counsel also made a curious remark: “And I’ve also spent enough time that I exceeded the allowance limit just in the time I’ve been looking for a doggone expert.” (TR. 62.) Counsel stated that Andrew Payne was his only prospective expert (TR. 62-63) but that he was not certain that Payne was qualified to testify (TR. 69). The record indicates that the trial court had previously suggested that counsel contact Payne; counsel stated that he had initially not contacted Payne because counsel had asked attorneys about Payne and the attorney who was familiar with Payne would not recommend him. (TR. 70-71.) Counsel then told the court, “So now I’m stuck that he’s the only guy I could possibly produce.” (TR. 71.) Furthermore, when Payne was questioned on cross-examination at trial about his fee, he testified that he was not certain that he would be paid any fee because trial counsel had told him he did not know, whether he could pay Payne. (TR. 1656.) When the prosecutor asked Payne whether he would submit a bill, Payne replied that if trial counsel “said that this is a — I hate to use the word charity, but if this is a case in which there are no funds to pay me it would be rather pointless to submit a bill.” (TR. 1656.) Payne further testified that he had never discussed his fee with trial counsel; counsel told him that he was not sure he could pay Payne, and Payne said he told counsel “that’s all right with me.” (TR. 1656.)
Trial counsel testified at the Rule 32 hearing that he did not believe that Payne had the expertise needed in the case and that Payne’s trial testimony had not been effective. (R. 188.) Trial counsel also testified that he did not retain any of the several experts he believed would have been qualified to testify because the statute governing fees for experts prevented him from obtaining additional funding to hire one of the qualified experts. (R. 188, 207.)
Hinton alleged that counsel was ineffective because he failed to secure additional funds to hire a competent expert.[22] The Rule 32 court and the majority have failed to address this claim; they essentially avoided Hinton’s claim by arguing that Payne’s testimony was adequate. While that argument fails utterly to persuade, as will be discussed below, the underlying argument regarding counsel’s failure to seek additional funds has merit, and it should have been addressed.
At the time of Hinton’s trial in 1986, § 15-12-21, Ala.Code 1975, addressed the appointment of counsel for indigent defendants. Section 15 — 12—21(d) contained a *318 limit on attorney fees, but it stated, in relevant part, “Counsel shall also be entitled to be reimbursed for any expenses reasonably incurred in such defense to be approved in advance by the trial court.” Previous versions of the statute allowed reimbursement of expenses in an amount up to one-half of the attorney’s fees, which had a statutory cap of $1,000. See Smelley v. State, 564 So.2d 74, 88 (Ala.Crim.App.1990). “This section was amended by Act No. 84-793, 1984 Ala. Acts 1st Ex.Sess., p. 198, § 1, effective June 13, 198k ....” Dubose v. State, 662 So.2d 1156, 1177 n. 5 (Ala.Crim.App.1993), aff'd, 662 So.2d 1189 (Ala.1995) (emphasis added). As Hinton notes in his brief on appeal at page 73 n. 39, the version of the statute in effect at the time of Hinton’s trial, which began more than two years after the amendment became effective, contained no spécifíc limit on funds available for experts. Trial counsel’s beliefs that he was unable to hire a qualified expert because the statute limited the amount of compensation and that he was “stuck [with Payne because] he’s the only guy I could possibly produce” (TR. 71) were incorrect. Trial counsel was limited only by his lack of knowledge of the relevant law.
The United States Supreme Court stated that the Sixth Amendment right to counsel means that every attorney “has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.” Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (citing Powell v. Alabama, 287 U.S. 45, 68-69, 53 S.Ct. 55, 77 L.Ed. 158 (1932)). The Strickland Court also stated:
“[Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel had a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.”
466 U.S. at 690-91.
The record of the trial and the record of the Rule 32 proceedings reveal clearly that trial counsel’s failure to seek additional funds to hire a qualified expert was not based on any trial strategy but, instead, on counsel’s mistake about the provisions of the statute governing payment of expenses for experts. Counsel’s ignorance of the law was clearly outside the range of reasonable professional assistance.
In Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), trial counsel failed to file a timely suppression motion because he did not know a search had taken place, and he failed to request discovery (or learn of the search) because he mistakenly believed that the prosecution was obliged to turn over incul-patory evidence without a request from him. The Supreme Court held that, even viewing counsel’s failure to conduct discovery from his perspective when he decided not to conduct discovery, and even granting deference to counsel’s judgment, counsel’s decision was unreasonable. 477 U.S. at 385. So, too, was trial counsel’s performance in this case. While complaining repeatedly to the trial court on the record about his inability to hire a qualified expert because of funding limitations, counsel hired an expert he considered to be unqualified. Counsel failed to conduct a reasonable investigation — or any investigation — into the current law; he failed to discover that the former statutory limitation had been eliminated 18 months before the pretrial hearings were held in this case, and more than 2 years before the *319 trial began. As a result of his failure to recognize that the law regarding compensation for experts had changed, counsel proceeded to trial believing he was “stuck” with an unqualified witness. It is counsel’s own deficient performance that caused him to be “stuck,” and this performance, under prevailing professional norms, was unreasonable.
In a similar case involving trial counsel’s mistake about funds available to hire an independent mental-health expert, counsel’s decision to proceed without an independent expert was found to be outside the wide range of reasonable professional assistance. Loyd v. Whitley, 977 F.2d 149 (5th Cir.1992). The court stated:
“The state court’s factual findings make clear that the decision of defense counsel not to pursue an independent psychological analysis of [the'appellant] was neither a strategic choice made after investigation nor a strategic choice made in light of limits on investigation. There were no limitations; funds were available. According to the state factual findings, [lead counsel’s] decision had nothing to do with strategy; he wrongly assumed that funds were unavailable and he abandoned what he knew to be an important pursuit. [The second attorney’s] decision had not been made after thorough investigation of the law; [counsel] was unaware of the law.”
977 F.2d at 158 (footnote omitted).
It is axiomatic that effective assistance of counsel requires knowledge of current state law. An attorney’s “lack of knowledge or misunderstanding” of the relevant law “is not only unacceptable under Supreme Court and circuit law,” but it is “reprehensible representation in a death-penalty case with [an appellant’s] life weighing in the balance.” Hardwick, v. Crosby, 320 F.3d 1127, 1185 n. 207 (11th Cir.2003). That trial counsel was unaware of this significant amendment to the law, which became effective months before any of the crimes with which his client was charged occurred, constitutes deficient performance.[23] The avoidance of this claim by the trial court and the majority, and their avoidance of what I believe is a necessary finding of deficient performance, should not stand; their finding that counsel’s performance was not deficient certainly will not stand in the inevitable upcoming reviews by the Alabama Supreme Court and by federal courts in habeas proceedings.
B. Prejudice
Trial counsel’s deficient performance in failing to seek additional funds to hire a competent expert when he was fully cognizant of the fact that Payne was neither qualified nor competent to testify as a toolmark examiner for Hinton does not end the inquiry. Strickland v. Washington requires a finding of deficient performance and prejudice. Strickland v. Washington, 466 U.S. at 687. The prejudice requirement mandates that the defendant establish that trial counsel’s “errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.” Id. “The defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. at 694.
Hinton fully satisfied his burden of proof. I disagree with the conclusion reached by the Rule 32 court and the majority that Hinton failed to demonstrate *320 how he was prejudiced by trial counsel’s decision to present Payne as his expert instead of a competent and qualified witness.[24]
The majority summarizes the substance of Payne’s testimony and his conclusion that none of the bullets recovered from the crime scenes could have been fired from the firearm found in Hinton’s mother’s house.[25] The majority fails to acknowledge the main point of Hinton’s argument on this claim — that Payne’s testimony added little or nothing to the defense case because Payne was soundly discredited at trial by the prosecution, and that presentation of a qualified expert would have changed the outcome of the trial. I do not disagree with the majority’s summarization of Payne’s testimony on direct examination, but that summarization fails to reveal other significant portions of Payne’s testimony or the prosecutor’s own summary of that testimony at closing argument. Those portions of the record are necessary to an understanding of the significant prejudice Hinton suffered as a result of trial counsel’s deficient performance in failing to seek additional funds to hire a competent expert.
I first note that Payne was a civil engineer, not a firearms and toolmark investigator, and that he received his engineering degree in 1933, more than 50 years before Hinton’s trial. (TR. 1571-72.) He spent many years in the military and worked with weapons, but he testified that his duties included “working on various bombs and fuses and then designing delivery schemes with bombs for certain specialized targets” and being the “project officer for the .60 caliber machine gun.” (TR. 1573, 1575.) On cross-examination, the prosecutor first elicited from Payne that his work involved specifically matching a bullet to a barrel for only 8 or 9 months of his 25-year career. (TR. 1642.) Payne testified that when he arrived at the state forensics laboratory to examine the evidence, he brought his headpiece, vernier caliper, and his scale. (TR. 1648.) Later in his cross-examination of Payne, the prosecutor read from a 1956 edition of a text Payne had provided to trial counsel, Fireamis Inves *321 tigation, Identification and Evidence. (TR. 1660, 1663.) The prosecutor read from a section entitled, “The Charlatans,” as follows:
“Following the invention of photographic and plastic impressions was a heyday of charlatans. Very few judges knew of anything about firearms. They had heard rumors of marvelous developments. The world was willing to accept anything said to be ... scientific. Almost anyone was permitted to testify in court as an expert. Many had little knowledge but a natural core presence and a great deal of gall. For $50.00 a day, a lot of money in those days, they would go cheerfully into court and swear to most anything. [With a pair] of outside calipers, an ordinary hand magnifying glass and a steel gauge [or scale] ... they would cheerfully swear away the life of an innocent man or free, for further depredations against society, the most atrocious criminal.”
(TR. 1666-67.)(Emphasis added.) Payne acknowledged that he had those tools with him when he examined the evidence, but in a failed attempt at humor, he told the jury that his scale “must be twice as good as the one they’re talking about in the book because mine is graduated in 64ths.” (TR. 1667.)
During cross-examination, the prosecutor established that Payne had difficulty operating the microscope at the State forensics lab and that he dropped one of the evidence bullets on the floor while he was examining it. (TR. 1651-54.) Payne stated that, in the seven or eight years before the trial, he had testified in two criminal cases involving firearms and toolmark identification, and one of the cases involved a shotgun, not a handgun. (TR. 1654-55.)
The final questions and answers on cross-examination were:
“[Prosecutor]: Mr. Payne, do you have some problem with your vision?
“[Payne]: Why, yes.
“[Prosecutor]: How many eyes do you have?
“[Payne]: One.”
(TR. 1667.) •
The prosecutor’s cross-examination of Payne was devastating; it virtually destroyed Payne’s credibility. The prosecutor completed that destruction in his closing argument. He noted that Payne’s expertise was not in the area of firearms and toolmarks but in military ordnance, while the State’s experts had years of training and experience in the relevant field and had -testified repeatedly throughout the State. The prosecutor stated that Payne had graduated in 1933 with a degree in engineering, and he argued, “Well, a consulting engineer, ladies and gentlemen, is not a firearms and tool marks expert, and he’s no expert. No expert at all.” (TR. 1727.) The prosecutor later argued:
“That demonstrates to me that he knows very, very little about what he came up here to testify about, very little. I said, ‘Are you familiar with a comparison microscope?’ ‘Of course, I’ve used it at least a thousand times,’ and yet when he goes to a lab to use a comparison microscope, he admitted that. It is startling and disturbing, alarming and almost sickening to see someone come up here and give an opinion like that when he tries to cut on the illumination on the microscope, he reaches over and he puts his hand on an electric inscribing tool and cuts that on. This man has no idea, he didn’t have a clue about what he was doing. And was going through a learning process right there, but it didn’t bother him, it doesn’t faze him, he’s *322 ready to come down here and give his opinion as an expert witness.”
(TR. 1728.)
The prosecutor argued that the tools Payne used were totally inappropriate and that his use of the stainless steel calipers on the bullets and the gun barrel “demonstrates that Andrew Payne, Jr., did not know what in the world he was doing, but he is ready to come down here and tell you, ‘I’m an expert’ .... ” (TR. 1730.) The prosecutor argued further, “This is a one-eyed man, what kind of depth perception does a one-eyed man have?” (TR. 1731.) He read to the jury “The Charlatans” section of the book Payne had provided and that he had read during Payne’s cross-examination and stated, “And I would submit to you that is exactly what you heard from Andrew Payne.” (TR. 1732-33.) Near the end of his closing argument, the prosecutor concluded his assault on Payne’s credibility:
“My Lord in heaven, the height of irresponsibility for somebody to come in here and do something like that. That is incredible. It’s irresponsible and I ask you to reject his testimony and you have that option because you are the judges of the facts and whose testimony, Mr. Yates’ or Mr. Payne’s, you will give credence to, and I submit to you that as between these two men there is no match between them. There is no comparison. One man just doesn’t have it and the other does it day in and day out, month in and month out, year in and year out, and is recognized across this state as an-expert.”
(TR. 1733-34.)
The prejudice to Hinton that resulted from counsel’s failure to investigate the law and to seek funds to hire a competent and qualified expert is obvious from the trial record alone. The prosecutor effectively called the jury’s attention to Payne’s lack of experience and qualifications, the errors he made during his examination of the evidence, and the fact that he had only one eye. That Payne arrived at the State laboratory with the very instruments mentioned in a section entitled “The Charlatans” in a reference book he provided to defense counsel allowed the prosecutor to cast Payne as a charlatan who was completely lacking in credibility and unworthy of any belief. The trial record establishes the prejudice Hinton suffered because he did not receive the competent defense expert to which he was entitled. Payne was mocked and represented to be no better than a buffoon and a paid liar. The testimony on the only physical evidence that connected Hinton to any of the crimes was useless to him because it was delivered by a witness who was not qualified or competent to render the opinions.
While the prejudice to Hinton is evident in the trial record, the evidence presented at the Rule 32 hearing amplified that prejudice.[26] Lannie Emanuel, a firearms and toolmark examiner with the Southwestern Institute of Forensic Sciences in Dallas, Texas, also known as the Dallas County Crime Laboratory, testified that he had been conducting examinations since 1979 *323 and had testified in more than 250 cases. (R. 61-65.)[27] Raymond Cooper is also employed at the Dallas County Crime Laboratory and testified that he had been a firearms and toolmark examiner since 1972. He had completed more than 5,000 firearms and toolmarks examinations and had testified as an expert on firearms and toolmarks examination between 250 and 350 times. (R. 113-14.) The third expert at the Rule 32 hearing was John Dillon, a forensic consultant with a specialty in firearms and toolmark identification who had been trained at the Federal Bureau of Investigation (“FBI”) laboratory beginning in 1976. (R. 135.) From 1988 until he retired from the FBI in 1994, Dillon served as chief of the firearms and tool-mark unit at FBI headquarters. After he retired from the FBI, he provided forensic training and consultation with groups such as the Washington, D.C., police department, the FBI, and the Bureau of Alcohol, Tobacco, and Firearms'. He was the immediate past president of the Association of Firearms and Toolmark Examiners.
Payne’s 1933 engineering degree and his experience with military ordnance stand in stark contrast to the experience and qualifications of these competent and qualified witnesses. If trial counsel had presented a qualified and competent witness similar to Emanuel, Cooper, and Dillon, the prosecutor could not have argued to the jury that the defense expert was “no expert at all,”, or that he was in the learning process when he examined the evidence, or that “[i]t is startling and disturbing, alarming and almost sickening to see someone come up here and give an opinion like that .... ” This Court has held that it is reasonable to presume that a jury would afford more weight to the testimony of a renowned expert than it would to a lesser-qualified expert. Banks v. State, 845 So.2d 9, 28 (Ala.Crim.App.2002). It is even more reasonable to assume that a jury would afford more weight to the testimony of a competent and qualified expert than to a witness who had, at best, minimal qualifications. Hinton provided ample proof of the prejudice he suffered as a result of trial counsel’s deficient performance.
In upholding the trial court’s denial of relief on this claim, the majority relies on Payne’s experience with firearms, his testimony about firearms, and his determination that none of the bullets recovered at the crime scenes matched the weapon recovered from Mrs. Hinton’s house. The majority asserts that Payne’s testimony was more favorable than that of the Rule 32 experts because he testified unequivocally that none of the bullets had been fired from Mrs. Hinton’s weapon. 172 So.3d at 289. However, as noted in footnote 25, supra, Cooper and Emanuel both testified that their examinations revealed that the recovered weapon could not have fired the bullets recovered from the Smotherman shooting because the Smoth-erman bullets were more misshapen than any bullet they could produce with the recovered weapon. All three experts testified, furthermore, that they could determine only that both of the bullets at the first crime — the Davidson murder — had been fired from the same gun.[28] Other *324 wise, they were unable to determine whether the two bullets fired at the second murder had been fired from the same gun, nor could they determine whether the two bullets recovered from the Smotherman shooting had been fired from the same gun. Emanuel and Cooper testified that the test bullets they fired from the weapon recovered from Mrs. Hinton had markings from the barrel’s lands and grooves that were classified as “five right.” (R. 74-75.) No land and groove markings were visible on any of the bullets recovered from the victims. (R. 75-78.) Emanuel testified that he was unable to match any of the crime scene bullets to the weapon recovered from Mrs. Hinton. (R. 77-78.) All of the experts testified that they could not otherwise determine whether the Hinton gun fired the crime-scene bullets. Finally, two of the witnesses testified that the ethics code for the Association of Firearms and Toolmark Examiners requires that examiners confer before a case goes to court if they have reached different results in testing. (R. 107, 145.) Emanuel testified that, based on the ethics code, he asked Lawden Yates if he would show Emanuel what he had seen and how he had determined that the six crime-scene bullets were fired from the same gun. Yates refused to do so. (R. 107.)
If such testimony had been presented at Hinton’s trial by qualified, competent experts in the field of firearms and toolmark examinations, there is a reasonable probability that the result of the proceeding would have been different. There exists ample evidence that the adversarial system suffered a severe breakdown here because of trial counsel’s ignorance of the law and his resulting decision to retain an unqualified witness. As a result, the confidence in the outcome of Hinton’s trial has been seriously undermined. The trial court incorrectly denied Hinton relief on this claim of ineffective assistance of counsel and that judgment is due to be reversed. Hinton established that trial counsel’s performance was deficient and that he was prejudiced. Hinton must receive a new trial with effective counsel who will retain a competent firearms and tool-mark expert to testify about the crucial evidence in this case.
II.
Hinton’s trial was also rendered unfair and the result reached was unreliable because the State violated Brady v. Maryland 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, Hinton alleged in his petition that the State failed during the discovery process to provide him with the worksheets prepared by Lawden Yates and David Higgins when they examined the bullets and the weapon. He alleged that the worksheets contained question marks where information about the class characteristics (lands and grooves and twist) was to have been recorded and that the evidence would have been critical to the defense. (C. 437.) The trial court and the majority determined that Hinton failed to prove this claim because the State’s experts did not rely on class characteristics to conclude that the crime scene bullets matched the gun recovered from Mrs. Hinton’s house. The majority also states that the prosecution’s experts testified that their conclusions regarding the match were based on striations, or tiny lines, on the bullets and that they did not make notations about the striations, they simply reported that the recovered bullets matched the Hinton weapon. I disagree with the majority’s analysis and conclusion.
A defendant is entitled to relief on a Brady claim if he establishes that the *325 State suppressed evidence that was exculpatory or favorable to him and was material to the issues at trial. E.g., Flowers v. State, 922 So.2d 938, 951 (Ala.Crim.App.2005).- Evidence is material if there is a reasonable probability that the result of the proceeding would have been different if the State had disclosed the evidence. United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A reasonable probability is shown when the State’s suppression of evidence undermines confidence in the outcome of the trial. 473 U.S. at 678. A defendant establishes a Brady violation when he shows “that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (footnote omitted).
“Impeachment evidence, however, as well as exculpatory evidence, falls within the Brady rule. See Giglio v. United States, 405 U.S. 150, 154 (1972). Such evidence is ‘evidence favorable to an accused,’ Brady [v. Maryland, 373 U.S. 83, 87 (1963) ], so that, if disclosed and used effectively, it may make the difference between conviction and acquittal. Cf. Napue v. Illinois, 360 U.S. 264, 269 (1959) (‘The jury’s estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant’s life or liberty may depend’).”
United States v. Bagley, 473 U.S. at 676.
“Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.” Davis v. Alaska 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The worksheets should have been provided to the defense. The suppressed evidence was favorable to Hinton and material to the issues at trial — principally, whether the recovered bullets matched the gun seized at Mrs. Hinton’s house. The State’s suppression of that evidence denied Hinton his right to cross-examine the State’s witnesses on the missing data on the worksheets and prevented him from raising questions about the validity and credibility of the testimony presented by the State’s experts. The trial court erred when it denied relief on this claim, and that judgment should be reversed. Hinton is entitled to a new trial based on this claim of error.
The worksheets in question are documents used to record data from the examinations of firearms, bullets, and cartridges. The worksheets contain spaces to record information about 12 criteria that might be revealed from the examination of bullets, including the number of lands and grooves, the width of the lands, the width of the grooves, and twist. (C. 2485, 2487.)[29] The worksheets completed by Yates and Higgins during their examinations of the bullets recovered from the crime scenes contain many dashes and question marks in the spaces designated for information about twist and lands and grooves, indicating that measurements were impossible to discern or were not taken. (C. 2258, 2323-24.) Examination of the weapon recovered at the Hinton house revealed class characteristics of “5 right,” meaning the barrel had 5 lands and grooves and that bullets fired from it were marked with a right twist. (C 2485.) Trial counsel did not know that the State’s experts had been unable to discern or measure the class characteristics of the bullets recovered at *326 the crime scenes because this crucial information had not been disclosed to him.' He was unaware that the recovered weapon had class characteristics of “5 right,” and that none of the crime-scene bullets were found to possess those class characteristics. Counsel was denied the opportunity to question the State’s experts about the reliability of their conclusions because he was denied access to the very information that would have permitted him to do so. Hinton’s constitutional right to a full and meaningful cross-examination was denied by the State’s failure to disclose the worksheets, in violation of Brady and its progeny.
The State argued on appeal, and the majority holds, that the worksheets did not contain exculpatory or material information because, it argues, the State’s experts did not base their conclusions on the class characteristics of the bullets; rather, they based their conclusions that all of the crime-scene bullets were fired from the Hinton weapon on the microscopic striations on the bullets. The record, however, does not support this assertion. Higgins testified, in response to the prosecutor’s question about the comparison of the bullets from the Davidson murder to the Hinton weapon: “After determining that there’s some similarities as far as caliber, class-type characteristics as best can be determined — ” (TR. 1210.) (Emphasis added.) Yates testified, “After examining the six [crime-scene] bullets I was able to determine that they possessed and were fired from a firearm with the same class characteristics, those being a .38 or that size caliber firearm, and that it would be a revolver because of the skid marks found on those bullets .... ” (TR. 1287.) (Emphasis added.) Furthermore, during the prosecution’s direct examination of Higgins and Yates, he elicited testimony about how lands and grooves affect a bullet as it is fired and how each barrel marks bullets in a unique, repetitive way. (TR. 1219, 1222-23, 1230-31, 1275, 1275-6, 1288.) Immediately after Higgins testified about lands and grooves and twist, the prosecutor asked whether he had compared the two bullets he had test-fired from the Hinton weapon; Hinton testified that he observed “repetitive markings” on the bullets. (TR. 1223.) The prosecutor then asked Higgins whether he had compared the test bullets to the bullets from the Davidson murder, and Higgins testified that he observed “repetitive marks” on the crime-scene bullets. (TR. 1225.) He concluded that the crime-scene bullets had been fired down the barrel of the Hinton weapon. (TR. 1233-34.)
The majority correctly states that, in their depositions in this Rule 32 proceeding, Yates and Higgins testified that their-conclusions were based on microscopic striations and not on lands and grooves and twist. However, that point was not apparent from their testimony at triál, and the prosecution’s elicitation of téstimony about class characteristics logically indicated to the jury that Yates’s and Higgins’s conclusions were, in fact, based on class characteristics in addition to microscopic striations. At a minimum, trial counsel should have been provided the worksheets so that he could have cross-examined the State’s witnesses about the many dashes, question marks, and missing data about lands and grooves and twist on the crime-scene bullets. Trial counsel should have been able to cross-examine the State’s experts on why the recovered weapon and the test-fired bullets had class characteristics of “5 right,” while none of the crime-scene bullets had class characteristics. Trial counsel should have been allowed to argue to the jury that the conclusions of the State’s experts were based on minimal data and not on an extensive series of measurements and class characteristics *327 which their testimony implied. Finally, if trial counsel had known that the State’s experts had not based their opinions at all on class characteristics, trial counsel might have attempted to prevent testimony from those experts about class characteristics; counsel could have argued that testimony about class characteristics would have been irrelevant because the experts had not based' their conclusions on class characteristics.
The State violated Brady v. Maryland when it suppressed the firearms worksheets. The evidence was favorable to Hinton and it was material to the most crucial issue in the case. Hinton was denied his right to cross-examine the State’s experts on evidence that would have raised questions about the validity and certainty of their conclusions that the crime-scene bullets matched the weapon recovered from Hinton’s mother’s house. The jury’s lack of exposure to evidence of the uncertainty of the State’s experts about class characteristics could have made the difference between conviction and acquittal.
“We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the prosecution witness’s] testimony which provided ‘a crucial link in the proof ... of petitioner’s act.’ Douglas v. Alabama, 380 U.S. [415, 419 (1965) ].”
Davis v. Alaska, 415 U.S. at 317.
“On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right of effective cross-examination which ‘ “would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.” Brookhart v. Janis, 384 U.S. 1, 3 [(1966) ].’ Smith v. Illinois, 390 U.S. 129, 131 (1968).”
Id. at 318.
Hinton is entitled to relief on this claim. The trial court’s judgment is due. to be reversed, and Hinton should receive- a new trial.

Conclusion

Anthony Ray Hinton did not receive a fair trial. His capital-murder convictions and death sentence were obtained after the had State suppressed favorable, material evidence and after trial counsel had rendered ineffective assistance by failing to seek additional funds for an expert and by presenting an unqualified witness to testify as an expert. In all my tenure on the bench, I have never seen the State successfully prosecute a capital-murder case when the only evidence of guilt consisted of testimony by a firearms and tool-mark expert. This was an amazing prose-cutorial feat, which could have been tested if Hinton had received effective representation and had been provided full and complete discovery. Hinton received neither.
Confidence in the outcome of Hinton’s trial has been seriously undermined as a result of the errors discussed above. Because a man’s life hangs in the balance and because I am convinced that this case will not withstand the many additional levels of review in State and federal courts, the only remedy for these violations of Hinton’s *328 rights is to grant the relief requested in his Rule 32 petition — a new trial.
For the foregoing reasons, I dissent.

. The transcript of the trial proceedings will be designated by "TR_”

. The circuit court adopted the State’s proposed findings and order in toto.

19. The order actually states that Hinton alleged that trial counsel failed to present "on evidence that the bullets found at the crime scenes were not fired ....” (C. 1547.) The majority apparently determined that the trial court intended to interpret the claim to be that trial counsel failed to present any evidence about the bullets not matching the weapon recovered at Hinton's mother's house.

. Although the majority adopts the trial court’s findings on this claim, it then finds that the issue was not preserved for our review because it was not first presented to the court below. Although the claim could have been presented more clearly, I believe that Hinton’s argument was raised, and the trial court notes it in the portion of the order quoted by the majority. (C. 1548.)

. Citations to the clerk's record from Hinton's trial will be designated "TC_”

. The trial court and the majority summarized Hinton's claim as " 'Hinton alleges that his trial counsel was ineffective ... for failing to seek additional funds to hire a better expert witness 172 So.3d at 284 (quoting C. 1548) (emphasis added). The claim is more accurately characterized as alleging that trial counsel was ineffective for not securing funds to hire a qualified and competent expert, not a ''better” witness.

. Counsel appeared to be unaware of the 1984 amendment to the statute even in 2002 when he testified at the Rule 32 hearing. (R. 181, 188, 207.)

. In reaching it conclusion, the Rule 32 court relied on the rule of law stating that strategic choices based on a thorough investigation of the facts and the law are virtually unchallengeable. (C. 1550.) However, as discussed above, reliance on a claim of “strategic choice” fails utterly here because trial counsel’s decision to present Payne’s testimony was not based on strategy at all; it was the result of trial counsel’s ignorance of the current law. The majority apparently recognizes this because it did not adopt this portion of the trial court's order.

. The majority notes that Payne's testimony was unequivocal on that point, and asserts that none of Hinton's Rule 32 experts could testify unequivocally that the recovered bullets had not been fired from that weapon. The majority disregarded the significant testimony of Raymond Cooper of the Southwestern Institute of Forensic Sciences in Dallas, Texas, the Dallas County crime laboratory, who testified repeatedly that, in his opinion, State’s Exhibits 54 and 55, .the bullets recovered from the Smotherman shooting could not have been fired from the recovered weapon because the weapon could not produce a bullet that was marked and as misshapen as were the Smotherman bullets. (R. 121, 123, 129-30, 130.) Lannie'Emanuel, who is also employed at the Dallas County crime lab, testified that the weapon recovered from Mrs. Hinton’s house could not have fired State's Exhibit 54 from the Smotherman shooting. This testimony is especially significant because Smotherman identified Hinton as his assailant. If the jury had heard a qualified expert testify that the bullets retrieved at the scene of that shooting could not have been fired from the weapon recovered at Mrs. Hinton’s house, the prosecution’s entire case against Hinton would have had been seriously compromised. This testimony, alone, if it had been presented at Hinton’s trial, could have resulted in a different outcome.

. The Rule 32 record contains the deposition of Lawden Yates, who testified for the State at trial. Yates testified that he was “not particularly impressed with [Payne’s] capabilities in firearms and tool marks identification.” (C. 2304.) Yates explained that Payne "demonstrated an obvious limited ability to do the kind of work that we were conducting at the time even though he was brought in as an expert in firearms identification.” (C. 2304-OS.) Yates also testified that the tools Payne brought with him to examine the evidence "indicated to me that he probably had limited knowledge of firearms identification.” (C. 2305.)

. Pages of the transcript of the Rule 32 hearing will be designated "R_”

. I find it interesting that, when David Higgins first examined the two bullets from the Davidson shooting, he submitted a report on February 6, 1985, that stated, “Laboratory analysis revealed both bullets to be mutilated. This condition prevented further characterization.” (C. 1443.) (Emphasis added.) Yet, on August 2, 1985, Lawden Yates submitted a report stating that the two bullets from the Davidson murder had been compared to test bullets fired from the Hinton gun and that the examination "revealed ample evidence that each of the two submitted spent projectiles *324 were fired through the barrel” of the weapon recovered at Mrs. Hinton's house. (C. 1446.)

. The worksheets were admitted at the Rule 32 hearing. (R. 201-04.)